**STATE of Missouri, Plaintiff–Respondent,**

v.

**Michael A. MARSHELL, Defendant–Appellant.**

**No. 17596.**

Missouri Court of Appeals,
Southern District,
Division One.

Feb. 19, 1992.

Motion for Rehearing Denied
March 10, 1992.

Larry A. Schaffer, Independence, Catheryn B. Starke, Blue Springs, for defendant-appellant.

William L. Webster, Atty. Gen., Elizabeth L. Ziegler, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

PARRISH, Judge.

Michael A. Marshell (defendant) was convicted of the class C felony of possession of marijuana. § 195.202.2, RSMo Supp.1990. This court affirms.

This case was tried before the court without a jury after defendant waived his right to a jury trial. The trial court's findings have the force and effect of a jury verdict. Rule 27.01(b). Its judgment is to be affirmed if there is substantial evidence to support its findings. *State v. Giffin*, 640 S.W.2d 128, 130 (Mo.1982). On appeal all evidence tending to prove defendant's guilt is accepted as true, together with all inferences favorable to the state that can be drawn from the evidence. *Id.* Contrary evidence and inferences are disregarded. *Id.*

Defendant was a passenger in a motor home driven by Samuel Hearns. Defendant was riding in the front passenger seat. Another passenger, Bobby Skaggs, was in the rear of the vehicle. The motor home was observed drifting back and forth within its lane of travel by a Missouri State Highway Patrolman. The patrolman, Sergeant Penn, stopped the motor home to see if the driver was intoxicated or sleepy. Sergeant Penn asked Mr. Hearns for his

operator's license. He had no license. The patrolman then had Hearns leave the motor home and go to the patrolman's car. Hearns did not appear to be intoxicated. Sergeant Penn asked him where he was going. Hearns told the patrolman that he was going to Fort Wayne, Indiana, to attend his sister's wedding, but he did not know the name of the person that she was supposedly marrying. Sergeant Penn asked Hearns if the motor home belonged to him. Hearns said that it did not; that it belonged to defendant.

Sergeant Penn went to the passenger side of the motor home. Defendant stepped outside the vehicle. The patrolman asked defendant if the motor home belonged to him. Defendant said that it did not. Sergeant Penn asked defendant if he knew that Mr. Hearns did not have an operator's license. Sergeant Penn also. asked defendant where the occupants of the motor home were going. Defendant answered that he had not been aware that Hearns had no license and that they were going to Fort Wayne, Indiana, to his brother's wedding. Defendant told Sergeant Penn that his brother's name was Bruce Hill, but defendant did not know the name of the person Hill was marrying.

Defendant told Sergeant Penn that he had rented the motor home the day before in Houston, Texas. After being told different reasons by Hearns and defendant for the trip to Fort Wayne and after determining that neither knew the identity of who their respective sister and brother were marrying,—Sergeant Penn had inquired to determine whether defendant's brother was marrying Mr. Hearns' sister—Sergeant Penn asked defendant if they were hauling contraband or weapons. Defendant said they were not. Sergeant Penn testified, "And I asked him if I could have permission to search the vehicle." Sergeant Penn testified that defendant responded, "Go ahead and search. I don't care."

Sergeant Penn awaited the arrival of another patrolman, Sergeant Robertson. When Sergeant Robertson arrived, Sergeant Penn had all three occupants of the motor home get outside of the vehicle. The patrolmen then proceeded to search the motor home. After looking through the kitchen area, they went to the back of the vehicle to an area where there was a bed. There was luggage lying on the bed. Sergeant Penn looked through the luggage. It contained clothing articles. He determined that the bed was constructed "on some sort of a spring system or something ... in order to make a storage compartment." Sergeant Penn lifted the bed. There were two suitcases underneath.

The patrolmen opened the suitcases. The first one had some clothing articles inside. Sergeant Penn explained, "[I]f you just brushed those aside, there was a large bundle wrapped in gray duct tape." The bundle contained marijuana. It "had layers of clear plastic and black plastic and coffee granules." The second suitcase had three smaller bundles wrapped in the same manner.

After finding the marijuana, Sergeant Penn and Sergeant Robertson went outside the motor home. Sergeant Penn arrested the three men and "read them their rights."

Sergeant Penn testified that he transported defendant to the county jail. In route, defendant "stated that ... he had made arrangements to take the marijuana to wherever they were going to sell it, and the other two men had assisted him in bundling up the marijuana and packaging it, and that, uh, he was just doing it because he needed some extra money, and that he was making about a hundred dollars a pound." There were about 54 pounds of marijuana taken from the motor home.

■ Defendant's first point on appeal contends that the trial court erred in finding defendant guilty "because the evidence of marijuana used to support [defendant's] conviction was illegally seized in that the search conducted by Trooper Penn exceeded the scope of the consent to search given by [defendant]."

Defendant's trial counsel characterized defendant's position with respect to the issue presented by the first point on ap-

peal, stating: "He did consent. There was never any doubt about that. But the only quarrel we had was with the, if the search exceeded the scope of the consent given."

The applicable testimony regarding defendant's claim that the search exceeded the scope of his consent came from Sergeant Penn and from defendant. Sergeant Penn testified in response to questions asked by the prosecuting attorney:

Q. All right, sir. And, uh, once you had determined that, uh, the vehicle wasn't his, but was rented, and once you had determined that, uh, although they both said they were going to the same location, their reasons for being there appeared to be different, what did you do at that point in time, Dale?

A. I became suspicious of their story, and, uh, asked Mr. Marshell if they were perhaps hauling any contraband or any weapons or anything, and he stated no, they were not. And I asked him if I could have permission to search the vehicle.

Q. All right. What did he tell you?

A. He said, uh, "Go ahead and search. I don't care."

And, upon cross-examination:

Q. Now in some fashion you asked, uh, Michael Marshell if, because of the suspicion of the inconsistency of the stories, you asked Michael Marshell if, uh, he was carrying a weapon or weapons and/or drugs, isn't that correct?

A. Yes, sir.

Q. And he said no, isn't that correct?

A. Correct.

Q. And you asked him if you could look around, is that correct?

A. I asked him if I could search the vehicle.

Q. Okay. But is it fair to say, Sergeant, that you don't specifically remember exactly the words you used when you asked him if you could search the vehicle?

A. Maybe not exactly every word. I know that anytime I ask anybody to search a vehicle I make it very clear to them that, I'm going to search your vehicle, and can I have permission to search? I don't say, Can I look around?

Defendant testified:

Q. Did, uh, did Sergeant Penn indicate to you at any time that he felt your story about where you were going was different than Sammy's?

A. After he come back and asked, you know, asked me that.

Q. Did he tell you he, uh, did he ask you if you had any guns or drugs or anything in that?

A. Yes, he did.

Q. And what did you say to that?

A. No.

Q. What did, what happened right after he asked you if you had drugs or guns and you said no?

A. Uh, yeah, he said, well, our story didn't match.

Q. Story didn't match?

A. Yeah. And he say, he say, uh, "Would you, would you mind if I look in your motor home?" Uh, and I say, "Well, I don't care. You can go ahead and look." 'Cause I mean, you know—

. . . . .

Q. Did you hear Officer Penn when he said that you, you said, quote, Go ahead and look?

A. Yes.

Q. "I don't care"?

A. Yes.

Q. Did you say that to him?

A. Yes, I did.

Q. And what was it that he asked you before you said, "Go ahead and look"?

A. Was it before he asked me that?

Q. Yeah?

A. Uh, could he look in the mobile home.

. . . . .

Q. To the best of your recollection, did, what words did he use? Did he say, "Can I look in your—"

A. "You mind if I look in the motor home?" is what he asked me.

Q. To the best of your recollection, that's what he said?

A. Yes.

Q. And you said, "Go ahead and look"?

A. Yes, sir.

In ruling on a motion to suppress evidence filed on behalf of defendant, the trial judge stated findings including:

In this case, when you take the totality of the circumstances, whether the word "search" or "look" was used by Sergeant Penn, when you put it in context in the totality of the circumstances, I don't believe these defendants were deceived, in that this was just going to be a, quote, peek into the van, as it was in the *Lorenzo* case. [*See State v. Lorenzo,* 743 S.W.2d 529 (Mo.App.1987).] [1]

In *Florida v. Jimeno,* 500 U.S. ——, 111 S.Ct. 1801, 1803-04, 114 L.Ed.2d 297 (1991), the court said, with respect to searches authorized by consent:

The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of "objective" reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?

In this case, Sergeant Penn inquired of defendant whether he was transporting contraband or weapons. This gave defendant notice about what Sergeant Penn was looking for. Defendant concedes that he consented to a search. The search was to be conducted inside the motor home. Accepting as true the evidence favorable to the state, particularly the testimony of Sergeant Penn with respect to what was asked of defendant in obtaining his consent to search the motor home, the scope of the search was not limited to "looking" at items in plain sight. A typical reasonable person would have understood that Sergeant Penn was asking to search those places in the motor home where drugs or weapons could be kept, including luggage and other containers.

In *U.S. v. Ross,* 456 U.S. 798, 820-21, 102 S.Ct. 2157, 2170-71, 72 L.Ed.2d 572 (1982), the extent of a lawful search was discussed. The Supreme Court held:

A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search.... A warrant to search a vehicle would support a search of every part of the vehicle that might contain the object of the search. When a legitimate search is under way, and when its purpose and its limits have been precisely defined, nice distinctions between closets, drawers, and containers, in the case of a home, or between glove compartments, upholstered seats, trunks, and wrapped packages, in the case of a vehicle, must give way to the interest in the prompt and efficient completion of the task at hand. [Footnote omitted.]

The court, in *Ross,* acknowledged that "[t]his rule applies equally to all containers." *Id.* at 822, 102 S.Ct. at 2171. The same rules that apply to searches authorized by the issuance of a warrant apply to searches authorized by consent. *See Walter v. U.S.,* 447 U.S. 649, 656, 100 S.Ct. 2395, 2401, 65 L.Ed.2d 410 (1980).

Defendant argues, however, that the facts and holding in *State v. Hyland,* No. 17131, 1991 WL 238599 (Mo.App.S.D. November 18, 1991), are consistent with the circumstances in this case and, based upon that case, the search of the motor home was illegal. He also contends that *Florida v. Jimeno, supra,* contains dictum that is

---

1. In *Lorenzo,* after a patrolman stopped a van, the patrolman asked if its owner minded if he "looked" inside. The owner replied, "No." The patrolman testified that he did not intend to search the vehicle, that he was "just going to peek in." 743 S.W.2d at 530. Prior to that time there had been no inquiries concerning whether contraband or drugs were being transported, and neither the patrolman who stopped the van nor another patrolman who had joined him had observed anything unusual. Nevertheless, the officer opened a door to the van and went beyond "peeking" inside the vehicle. The officer moved a back pack that was beneath a seat, discovered a film container, opened it and found a controlled substance. The court held that consent was not given to search the vehicle; that "[c]onsent to search cannot be considered freely and intelligently given when a police officer misleads the person from whom consent is sought as to his intentions." *Id.* at 532.

applicable here so as to distinguish that case.

In *Hyland*, this court held that the search of a suitcase found in the trunk of a car was illegal because it exceeded the scope of the consent that was given to conduct the search. The facts upon which that finding was based differ from those in this case. *Hyland* involved a defendant who was stopped for a traffic violation. The patrolman who stopped the car thought the driver was "nervous and uneasy." There were no personal belongings in the passenger compartment. As a matter of "general curiosity," the patrolman asked to see in the trunk and then to look in a suitcase to verify that it contained clothing. When the suitcase was opened, the officer observed that it contained clothing. He then reached into the suitcase and felt a package. He removed the package. It contained marijuana. This court held that the search was illegal. *Hyland* differs from this case. In *Hyland*, no inquiry had been made with respect to whether the car had contraband prior to the search. Nothing unusual was observed other than, perhaps, the driver's nervousness. This court held that the totality of the circumstances did not substantiate that consent had been given to search for marijuana. It was held in *Hyland* that the granting of the request to "look" in the trunk and to "look" in the suitcase would not have been understood by a typical reasonable person, under the circumstances in that case, as the giving of consent to the officer to insert his hands into the suitcase. *Hyland* is of no assistance to defendant.

In relying on the language in *Florida v. Jimeno, supra,* that he considers applicable to this case, defendant points out that the court upheld a police officer's right to open a paper bag that was found on the floorboard of a car. The officer had the owner's consent to search the car. Defendant calls attention to the fact that the court discussed how *Jimeno* differed from *State v. Wells*, 539 So.2d 464 (Fla.1989), *aff'd on other grounds*, 495 U.S. 1, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990), in which a locked brief case taken from the trunk of a car was broken into. In *Wells*, consent was given to search the trunk. The court upheld a suppression order as to the contents of the brief case. In *Jimeno*, the court suggested that it very likely was "unreasonable to think that a suspect, by consenting to the search of his trunk, ha[d] agreed to the breaking open of a locked briefcase within the trunk." 111 S.Ct. at 1804. This court does not find that the unlocked luggage that contained marijuana and was located in the passenger area of the motor home in this case is analogous to the locked briefcase that was in the trunk of the car in *Wells*. Defendant's argument with respect to the applicability of the dictum in *Jimeno* is not persuasive.

■ Defendant's first point on appeal asserts that the evidence in this case was not sufficient to support a conviction for the offense of possession of marijuana. If the marijuana that was found was admissible, there was sufficient evidence from which the trial court could find defendant guilty. If the marijuana was not admissible, the evidence was not sufficient. The trial court, following a hearing held on defendant's motion to suppress evidence, determined that the marijuana could be admitted into evidence. The trial court denied the motion to suppress. This court's review of the trial court's denial of a motion to suppress evidence is limited to determining whether there was sufficient evidence to support the trial court's ruling. *State v. Burkhardt*, 795 S.W.2d 399, 404 (Mo. banc 1990). "The weight of the evidence and the credibility of the witnesses is for the trial court's determination." *Id.* The testimony of Sergeant Penn—evidence presented before the trial court at the hearing on the motion to suppress evidence—provided sufficient basis for the trial court to deny the motion and to determine that the marijuana was admissible evidence. Defendant's first point is denied.

■ Defendant's second point contends that the trial court erred in finding defendant guilty because the evidence of marijuana used to convict defendant was illegally seized in that the "pretextual nature of the traffic stop" that was used to obtain

defendant's consent to the search was unconstitutional in violation of § 43.200, RSMo 1986. The part of § 43.200 that defendant quotes in his brief as the basis for his second point is § 43.200.2 that states:

> The superintendent of the highway patrol shall see that every member of the highway patrol is thoroughly instructed in the powers of police officers to arrest for misdemeanors and felonies and to search and seize in order that no person or citizen traveling the highways shall be hindered, stopped, or arrested or his person or property searched or seized without constitutional grounds existing therefor.[2]

Defendant relies on *State v. Lorenzo, supra*, at 532, and *State v. Moody*, 443 S.W.2d 802, 804 (Mo.1969), for the proposition "that the pretextual use of a traffic violation to justify a search is a violation of the Fourth Amendment." The principle stated is sound. It is inapplicable to this case, however. The search in this case was not the product of a "pretextual" traffic stop. The search resulted from circumstances that caused Sergeant Penn to suspect a sinister purpose for defendant's presence. Those circumstances were manifested following the stopping of the motor home in which defendant was traveling. The motor home was observed weaving within its lane of travel. The patrolman observed the manner in which the vehicle was being operated. He questioned whether the operator was sleepy or intoxicated. The patrolman's actions were appropriate. Defendant's second point is denied.

The judgment is affirmed.

PREWITT, P.J., and CROW, J., concur.

---

2. Defendant's brief erroneously states that the quotation from § 43.200 is "Section 43.200.1 RSMo ... in its entirety."