**STATE of Missouri, Respondent,**

v.

**Marquis D. ROBINSON, Appellant.**

**No. SD 31757.**

Missouri Court of Appeals,
Southern District,
Division One.

Sept. 20, 2012.

***

Craig A. Johnston, Columbia, MO, for Appellant.

Chris Koster, Attorney General, Richard A. Starnes, Assistant Attorney General, Jefferson City, MO, for Respondent.

WILLIAM W. FRANCIS, JR., J.

Marquis D. Robinson ("Robinson") appeals the judgment and sentence of the trial court which convicted him of one count of the class A felony of robbery in the first degree, a violation of section 569.020; one count of the unclassified felony of armed criminal action, a violation of section 571.015; and one count of the class C felony of felonious restraint, a violation of section 565.120.[1] Following a jury trial, Robinson was sentenced as a prior and persistent offender to thirty years on the robbery charge, thirty years on the armed-criminal-action charge, and ten years on the felonious-restraint charge with the sentences to run concurrent to one another. In his sole point relied on, Robinson challenges the trial court's denial of his motion to suppress and admission of certain evidence, which he asserts was seized in violation of a search warrant. We affirm the judgment and sentence of the trial court.

**Factual and Procedural Background**

Robinson does not challenge the sufficiency of the evidence to support his conviction. Viewing the evidence in the light most favorable to the trial court's ruling, *State v. Taber,* 73 S.W.3d 699, 703 (Mo. App. W.D.2002), the record reveals that on the evening of October 2, 2010, Robinson robbed the Country Mart store in Rolla, Missouri. After grabbing the clerk by the collar and dragging him into the office where a female employee was located, Robinson instructed the employees to put the money from the cash register into a bag and then forced them to open the safe so he could take the box of cash kept in the safe.[2] Once Robinson had the box

---

1. Unless otherwise specified, all statutory references are to RSMo 2000.

2. At some point in time, the female employee pushed the silent alarm and summoned police. The police dispatch records indicate that call was received at 10:19 p.m.

   Additionally, there was testimony relating to the manner in which Country Mart kept and maintained its money. For example, their policy was to paperclip $1 bills in stacks of twenty-five then when they got four stacks of twenty-five, they would place a rubber band around those stacks and then put a rubber band around the stacks again when there was $500 worth of $1 bills. Similarly, when they got $100 worth of $5 bills, they would use a rubber band to secure those together and then when they got $1,000 worth of $5 bills, would place a rubber band around all of those stacks. Likewise, when they had accumulated a stack of ten $10 bills, they secured those to one another with a

from the safe, he ran from the store.[3] Once he departed the store, Robinson apparently left the hat he was wearing during the robbery, as well as the knife, in the stairwell of a neighboring building. He then discarded his black jacket, sweatshirt, shoes, a backpack, and the cardboard box from the safe in a dumpster near that building.

Shortly thereafter, around 11:00 p.m., cab driver Anthony Green ("Green"), who was familiar with Robinson from previous cab fares, was dispatched to Robinson's apartment building to pick up Robinson, his girlfriend, and her three children and drive them to Springfield, Missouri. Green recounted that he felt the situation was odd in that when he retrieved Robinson's girlfriend and her children they had no luggage, although they were clearly going to be spending at least the night in Springfield, and the children were without coats despite the cool weather. Green related he also found it unusual that Robinson exited the apartment not through the front door, but instead crawled out the kitchen window. Robinson appeared anxious to depart and was nervous overall. When they arrived in Springfield, Green dropped them off at a hotel and Robinson paid the $240 cab fare with $20 bills.

Robinson, his girlfriend, and her children then returned to Rolla the next day. The following day, October 4, 2010, Robinson paid $4,850 in cash for a used car at a local car dealership using mostly $20 bills. Robinson, who had pawned his rented furniture the previous week, then went to Rent–A–Center to pay his past due account, as well as take care of the pawn ticket and associated fees relating to the furniture. He paid approximately $3,321 in small bills. The manager at Rent–A–Center, who was familiar with Robinson, felt it was suspicious that Robinson suddenly had a new car, as well as sufficient cash to pay his overdue account. Noting Robinson matched the description of the Country Mart robber he had heard about on the news, the Rent–A–Center manager contacted police.

Officer Adam Meyer ("Officer Meyer"), with the Rolla Police Department, was dispatched to watch Robinson's residence. When Robinson arrived home, Officer Meyer made contact with him, received consent to pat him down, and discovered $1,700 in cash in the pocket of Robinson's pants. Detective Ken Nakanishi ("Detective Nakanishi"), who had been working on the Country Mart robbery case, then arrived and spoke with Robinson, who agreed to accompany the officers to the police station to be interviewed.

At the police station, Robinson was advised of his *Miranda*[4] rights, voluntarily agreed to speak with police, and denied any involvement in the Country Mart robbery. Robinson admitted to recently spending a great deal of cash, but asserted he paid off the Rent–A–Center account the Friday prior to the robbery and that the remaining cash was from "his hustles[,]" which he later explained was from selling marijuana and prescription medication. He related the cash found in his pocket was the only cash he had and there was no cash at his apartment. During this inter-

---

paperclip then when they got $1,000 worth, they put a rubber band around those stacks. With $20 bills, they put those into stacks of $1,000 and placed a rubber band around the stack. With $50 and $100 bills, when they got $1,000 worth, they would put a paperclip on the stack and place the stack in the box in the safe.

3. The testimony at trial was that because it was a weekend, there was more money than normal in the safe and the register such that the employees felt there was approximately $23,000 in the box Robinson took.

4. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

view, Robinson denied consent to search his apartment and eventually admitted it was because "he had a little bit of weed at his house and a pipe."

Based on this information, Detective Nakanishi secured a search warrant for Robinson's apartment, which allowed the officers to search for "Marijuana, drug paraphernalia, smoking devices and apparatus' [sic]. . . ." During the search, the officers found a bag of marijuana hidden under a hat and a glass pipe sitting on a shelf in the master bedroom. The search also revealed a large amount of currency variously bundled throughout the apartment. Once the currency was discovered, Detective Nakanishi "immediately" believed "it was the results [sic] of some other criminal activity." In the master bedroom, in a drawer of the nightstand, Detective Nakanishi found $400 in four bundles of $1 bills with $100 in each bundle, some of which had rubber bands around them. In a purse located in the master bedroom, the officers found $725 in $1 bills with the bills being bundled with rubber bands with $100 per bundle. They also discovered $7,750 in a Country Mart bag stuck down in a kitty litter container. That currency was composed primarily of $5 bills in bundles of twenty bills with rubber bands loosely around the stacks. The officers also seized Robinson's car from the apartment and searched it.

Later that week, after re-affirming with the Country Mart employees the manner in which they maintained their cash, Detective Nakanishi made contact with Robinson. At that time he searched Robinson, discovered $1,000 in cash in his shoe, and arrested him for the robbery at Country Mart. At Robinson's request, Detective Nakanishi spoke with him in a recorded interview on October 8, 2010. At that time, Robinson related that the money found at his apartment was from the Country Mart robbery but that it was his friend who committed the robbery. Detective Nakanishi did not believe Robinson and later cleared the friend Robinson implicated.

Prior to trial, Robinson filed a "MOTION TO SUPPRESS EVIDENCE: INVALIDLY EXECUTED WARRANT" in which he argued the seizure of the drugs and drug paraphernalia, as well as the currency in the amount of $8,675, "was unlawful in that authorities went beyond the scope permitted by the warrant and seized items completely unrelated to the purpose of the warrant. . . ." On July 20, 2011, a hearing was held on the motion to suppress. On August 3, 2011, the trial court denied Robinson's motion to suppress. Evidence and testimony relating to the currency found at Robinson's apartment, including photographs of the currency at the locations where it was discovered, were then admitted into evidence over Robinson's continuing objections. At the close of all the evidence, the jury found Robinson guilty of the three charged crimes. Robinson then timely filed a motion for new trial in which he asserted, *inter alia,* that the trial court erred in denying his motion to suppress; in overruling his objections to testimony from Detective Nakanishi and others relating to the items recovered from his apartment; and in admitting the photographs taken in his apartment. The trial court denied his motion for new trial and on October 24, 2011, sentenced him as set out above. This appeal followed.

In the sole point presented to this Court, we are asked to determine whether the trial court erred in denying Robinson's motion to suppress and in admitting evidence seized from his apartment pursuant to the search warrant.

### Standard of Review

"A trial court's ruling on a motion to suppress is reviewed to determine

if it is supported by substantial evidence, and it will be reversed only if it is clearly erroneous." *State v. Johnson*, 207 S.W.3d 24, 44 (Mo. banc 2006). "The trial court's ruling is clearly erroneous if we are left with a definite and firm belief a mistake has been made." *State v. Hunter*, 43 S.W.3d 336, 340 (Mo.App. W.D.2001). When reviewing a trial court's denial of a motion to suppress, appellate courts consider "the evidence presented both at the suppression hearing and at trial in determining whether the motion should have been granted." *State v. Goff*, 129 S.W.3d 857, 862 (Mo. banc 2004). We view the facts and any reasonable inferences arising therefrom in the light most favorable to the ruling of the trial court, and we give deference to the trial court's factual findings and credibility determinations. *Johnson*, 207 S.W.3d at 44. "If the ruling is plausible, in light of the record viewed in its entirety, we should not reverse, even if we would have weighed the evidence differently." *State v. Williams*, 277 S.W.3d 848, 851 (Mo.App. E.D.2009). Although we review the facts under a clearly erroneous standard, the issue of whether the Fourth Amendment has been violated is a question of law, and we review questions of law *de novo*. *State v. Brand*, 309 S.W.3d 887, 892 (Mo.App. W.D.2010).

## Analysis

Under this point relied on, Robinson urges various reasons for his assertion that the trial court erred in denying his motion to suppress and in admitting evidence and testimony relating to the items seized from his apartment. He asserts error in that "the search and seizure of the money was outside the scope of the search warrant issued by a judge, and seizure was not permitted by the plain view exception to the warrant requirement, since the incriminating nature of the money was not immediately apparent...." He maintains error in that "some of the money was located in a purse—an item clearly not [Robinson's.]" Further, he avers error in the fact that the State "did not establish that they found the money before they found the object of the search—a bag of marijuana and a pipe...." Based on the foregoing errors, he argues the evidence establishe[d] that the discovery of the money was not inadvertent, rather the officers were looking everywhere in the house for evidence of a robbery, which it was conceded by the officers that they did not have probable cause to belie[ve] that such evidence would be found in the home and that the application for a warrant to search for drugs was merely a subterfuge.[5]

We begin by determining whether the seizure of the currency from Robinson's apartment was valid under the search warrant issued. The Fourth Amendment to the United States Constitution guarantees citizens the right to be

---

**5.** As best we discern, Robinson's allegation relating to "subterfuge," argues the search warrant should be rendered invalid based on his assertion the officers had no real interest in seizing any drug evidence against him when they secured the search warrant and, instead, they essentially used the drug evidence as an excuse to gain access to Robinson's apartment to look for evidence of the robbery. The cases cited by Robinson are inapposite. Further, it has repeatedly been held by reviewing courts that, in relation to the subjective state of mind of the officer,

'[t]he fact that an officer is interested in an item of evidence and fully expects to find it in the course of a search should not invalidate its seizure if the search is confined in area and duration by the terms of a warrant or a valid exception to the warrant requirement.'

*U.S. v. Roberts*, 928 F.Supp. 910, 933 (W.D.Mo.1996) (quoting *Horton v. California*, 496 U.S. 128, 138, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990)). That portion of Robinson's argument fails and need not be more fully addressed.

free from "unreasonable searches and seizures." "Article I, section 15 of the Missouri Constitution provides the same guarantees against unreasonable search and seizures; thus, the same analysis applies to cases under the Missouri Constitution as under the United States Constitution." *State v. Oliver*, 293 S.W.3d 437, 442 (Mo. banc 2009). Search warrants are required to " 'particularly describe[e] the place to be searched, and the persons or things to be seized.' " *State v. Shaon*, 145 S.W.3d 499, 504 (Mo.App. W.D.2004) (quoting U.S. CONST. amend. IV); *see also* § 542.276.6(4) (providing that a search warrant must "[i]dentify the property, article, material, substance or person which is to be searched for and seized, in sufficient detail and particularity that the officer executing the warrant can readily ascertain it[.]").

> 'A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search. [ ... ] When a legitimate search is under way, and when its purpose and its limits have been precisely defined, nice distinctions between closets, drawers, and containers, in the case of a home ... must give way to the interest in the prompt and efficient completion of the task at hand.'

*State v. Melville*, 864 S.W.2d 452, 455 (Mo. App. W.D.1993) (quoting *U.S. v. Ross*, 456

U.S. 798, 820–21, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982)). Additionally, under "[t]he plain view exception to the Fourth Amendment warrant requirement," an officer is permitted to seize evidence in plain view when the evidence is in an area where the items described in the search warrant might be, and the incriminating character of the evidence is immediately apparent.[6] *State v. Kelly*, 119 S.W.3d 587, 592 (Mo. App. E.D.2003); *Arizona v. Hicks*, 480 U.S. 321, 326–27, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987). "The seizure of property in plain view is presumptively reasonable when probable cause exists to associate the property with criminal activity." *Shaon*, 145 S.W.3d at 505. "The incriminating nature of evidence is immediately apparent if 'facts available to the officer would warrant a person of reasonable caution in the belief, that certain items may be contraband [ ... ].' " *Id.* (quoting *Texas v. Brown*, 460 U.S. 730, 742, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983)) (internal quotation marks omitted).

■ Under the facts in this case, the search warrant was for the seizure of drugs and drug paraphernalia. The police officers, therefore, could validly search in any container, area, or location that could have conceivably held any amount of marijuana or any drug paraphernalia. This would include the drawers of the bedroom nightstand, the container of kitty litter, and the purse found in the bedroom—all of which were among the locations in Robinson's apartment from which the officers recovered currency.[7] The officers' actions

6. Robinson urges Missouri should follow certain other states and utilize the requirement that discovery of the evidence must also be inadvertent. However, in *State v. Blankenship*, 830 S.W.2d 1, 14 n. 10 (Mo. banc 1992), the Supreme Court of Missouri followed the federal trend and eliminated the inadvertent discovery requirement as a necessary component of plain-view searches. Accordingly, "[i]nadvertent discovery of the evidence is not a necessary condition" in this state. *State v. Phegley*, 826 S.W.2d 348, 357 (Mo.App. W.D.

1992). The adding of additional elements to doctrines or the reversion to elements previously utilized in such doctrines is not within the province of this Court as we are constitutionally bound to follow the edicts and decisions of the Supreme Court of Missouri. *State v. Tuter*, 920 S.W.2d 111, 112 (Mo.App. S.D.1996). This portion of Robinson's argument lacks merit.

7. Also, there is no merit in Robinson's assertion that the search of his girlfriend's purse found in the master bedroom was invalid

in the present matter were not outside the scope of the search warrant.

▮ In addition to clearly operating inside the scope of the search warrant, the police officers here also had the benefit of the plain-view exception. The officers were validly within Robinson's apartment under the search warrant when they encountered the currency evidence at issue. Further, the incriminating nature of the money was, based on Detective Nakanishi's testimony, "immediately" apparent in that it was bundled in a manner similar to that which was stolen from Country Mart. Detective Nakanishi knew at that time that Robinson, who was unemployed and forced to pawn his rented furniture just days prior, had since the time of the robbery paid cash for a new car, a roundtrip taxi ride from Rolla to Springfield, his overdue account at Rent–A–Center, his pawn fees, and was found with $1,700 in his pocket. Further, Robinson had denied to Detective Nakanishi that there was any additional cash at his home. Even if Detective Nakanishi did not have the aforementioned information about the robbery, Robinson had explicitly told him that he had been "hustl[ing]" by selling marijuana and prescription pain medication such that the currency could have been profits from drug money. Regardless of the source of the money, in the given situation, Detective Nakanishi had probable cause to believe the money was the result of some sort of criminal activity. As noted above, where the officers are lawfully present pursuant to a search warrant and they discover evidence of other crimes, such evidence is properly seized.

▮ Further, while Robinson argues the "State did not sustain its burden in proving that the money was discovered prior to their locating the marijuana and pipe[,]"[8] there is nothing in the case law presented by Robinson that requires such proof. The search warrant apparently stated simply that the items being searched for were marijuana and related paraphernalia. It did not set forth a specific amount of marijuana, it did not specify a certain kind or color of pipe, and it did not state any particular amount as to any of the items. The officers could have been looking for two pounds of marijuana or an ounce of marijuana—they had no idea what they were going to find within Robinson's apartment. Accordingly, it is axiomatic that the officers were allowed to search for any and all marijuana and drug paraphernalia that they could conceivably locate within that apartment. Whether they located the marijuana and pipe prior to or after they located the cash matters not. *See State v. Tolen,* 304 S.W.3d 229, 234 (Mo.App. E.D.2009) (holding that where the search warrant authorized a search for a laptop, "the officers were authorized to complete a search of the home for any other laptops" despite the fact that they had immediately located a laptop in the kitchen of the residence). The officers here could continue searching until they were satisfied that there was no other marijuana or drug paraphernalia existing within the residence. The requirement re-

---

based solely on the fact that a purse is "an item clearly not [his]." The law is clear that the officers could validly search within *any* item that could potentially hold either marijuana or drug paraphernalia. *Melville,* 864 S.W.2d at 455; *Ross,* 456 U.S. at 820–21, 102 S.Ct. 2157. Thus, they could validly search in the purse under the terms of the search warrant.

**8.** " 'At a suppression hearing, the State bears both the burden of producing evidence and the risk of nonpersuasion to show by a preponderance of the evidence that the motion to suppress should be overruled.' " *State v. Taber,* 73 S.W.3d 699, 703 (Mo.App. W.D.2002) (quoting *State v. Weddle,* 18 S.W.3d 389, 391 (Mo.App. E.D.2000)).

mains that they could search wherever they believed the items could potentially be and, as stated by the State in its brief, "[t]he discovery of one bag of marijuana and a single pipe ... did not de-authorize any further search for additional [drugs or] paraphernalia." Accordingly, the evidence seized from Robinson's apartment was validly procured by the officers in this matter such that the trial court did not err in denying his motion to dismiss and in admitting the evidence at trial. Point denied.

The judgment and sentence of the trial court is affirmed.

GARY W. LYNCH, P.J., and NANCY STEFFEN RAHMEYER, J., Concur.